IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GEO VANTAGE OF OHIO, LLC,

                            **Plaintiff,**

       **v.**

GEOVANTAGE, INC. et al.,
       **Defendants.**

Case No. 2:05-CV-1145
Judge EDMUND A. SARGUS, JR.
Magistrate Judge Norah McCann King

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss or Stay Pending Arbitration. (Doc. # 12). For the reasons that follow, the motion to stay is granted.

## I.

Plaintiff, GeoVantage of Ohio, LLC, ["Plaintiff"] originally brought suit against Defendants in the Court of Common Pleas for Madison County, Ohio. On December 22, 2005, Defendants filed their Notice of Removal to this Court. Plaintiff seeks declaratory and injunctive relief, together with claims for specific performance, an accounting, breach of contract and tortious interference with contract. Defendants move to dismiss Plaintiff's complaint for lack of subject matter jurisdiction. In the alternative, Defendants move to stay this proceeding pending arbitration of Plaintiff's claims.

Plaintiff is a limited liability company that provides airborne imaging services to customers. Its principal place of business is in Mt. Sterling, Ohio. Plaintiff names three Defendants: GeoVantage, Inc. ["GeoVantage"], a Delaware corporation with its principal place

of business in Swampscott, Massachusetts; John Deere Agri ["Deere Agri"], a Delaware

corporation with its principal place of business in Illinois; and Deere & Co. ["Deere"], also a

Delaware corporation with its principal place of business in Illinois.  Defendant GeoVantage

owns a unique camera system related to airborne imaging services and equipment, and it

franchises this system to several franchisees.  GeoVantage has been a wholly owned subsidiary

of Deere Agri since December 2005, when Deere Agri acquired GeoVantage.  [Mot. to Dismiss,

p. 4.]

On August 7, 2001, Plaintiff and GeoVantage signed and executed a Franchise

Agreement, the terms of which required GeoVantage to supply Plaintiff with cameras, software

and training manuals for the purpose of providing airborne imaging services to customers. [Am.

Compl., Exh. A., part. 1.]  William Pevear negotiated the Franchise Agreement on behalf of

GeoVantage.  Carl Hamman, the sole owner of Plaintiff GeoVantage of Ohio, LLC, along with

attorney Eric Schooley negotiated on behalf of Plaintiff.

Problems with the interpretation of the Franchise Agreement first arose with respect to

the duration of the Agreement and the terms for its renewal.  On May 19, 2005, John Prisco, the

Chief Executive Officer of Defendant GeoVantage, sent a letter to Hamman.  The letter advised

Plaintiff that the Franchise Agreement had expired and requested that Plaintiff return all

equipment and software to GeoVantage offices.[1]  On the same day Plaintiff, through its attorney,

---

[1]The letter reads, in pertinent part:

> Dear Mr. Hamman:
>
> Your franchise agreement with GeoVantage has expired.  As provided under the termination
> provisions of the agreement, we request that you return immediately all equipment and software to
> GeoVantage offices at 12 Pine Street, Swampscott, MA 01907.  [Am. Compl., Exh. B.]

responded to the letter stating that the Franchise Agreement did not expire until midnight August 6, 2006.  Plaintiff also intimated that it was aware of discussions between GeoVantage and John Deere.  Furthermore, Plaintiff hinted that it was willing to protect its investment in GeoVantage and its right to renew the Agreement.[2]  [Am. Compl., Exh. C.]  Plaintiff received no response from GeoVantage.

On May 27, 2005, counsel for Plaintiff sent a letter to Prisco, demanding that GeoVantage cease and desist its attempts to obtain possession of the camera system.  Plaintiff mentioned an attempt by "employees and/or agents" of GeoVantage, made on or about May 19, 2005, to obtain the camera system from Plaintiff "under false pretenses."  Plaintiff stated that GeoVantage "flew in" an employee, who improperly demanded the camera system and then threatened to file suit if Plaintiff did not turn over the camera system to GeoVantage.  According to Plaintiff, these actions by GeoVantage caused Plaintiff to be unable to remount the camera system, meaning that Plaintiff has been unable to conduct its business.  [Am. Compl., Exh. D.]

In addition, Plaintiff stated that GeoVantage's "relationship with John Deere likely precipitated the improper actions [of seizing the camera equipment]" and Plaintiff also noted that John Deere had attempted on at least one occasion to hire away Plaintiff's employees.  Plaintiff also stated in the May 27, 2005 letter that it was entitled to an accounting of any business conducted by John Deere or any other company within Plaintiff's territory. [Am. Compl., Exh. D.]  Plaintiff relied on Section 1.2 of the Franchise Agreement, which gave Plaintiff Franchisee

---

[2] The fifth paragraph of Plaintiff's letter contains the following text:

We understand that you are in discussions with John Deere.  We understand that Mr. Hamman's existence is inconvenient to those discussions.  You must understand that Mr. Hamman has expended vast amounts of time and resources toward creating a viable commercial entity out of this franchise and will take all steps to protect his investment.

3

the exclusive rights to process all orders within its territory, except where the orders were done by an out of territory franchise. If an out of territory franchise conducted work within Plaintiff's home territory, Plaintiff was contractually entitled to a 10% fee from that out of territory franchise. [Am. Compl., Exh. A.]

Finally, Plaintiff informed GeoVantage that it was exercising its option, in accordance with Section 2 of the Franchise Agreement, to extend the Franchise Agreement for another five years. Section 2 of the Franchise Agreement reads:

2. DURATION

2.1 The Franchise herein granted shall commence on the date of this Agreement and shall endure for a period of five (5) years, subject to any extensions permitted under Clause 2.2.

2.2 The Franchisee shall be entitled to renew this Agreement for a further period of five (5) years, provided that:

2.3 The Franchisee has given the Franchisor not less than six (6) months written notice prior to the above termination date of its intention to renew this Agreement;

2.4 There is no unremedied breach of any provision of this Agreement (or renewals thereof) by the Franchisee;

2.5 The Franchisee has during the currency of this Agreement, including any renewals hereof, carried on the business substantially in accordance with the terms and conditions of this Agreement and the requirements of the Franchisor; and

2.6 The Franchisee has not performed any act of commission or omission, which, in the opinion of the Franchisor, has brought or may bring disrepute to the Franchisor.

2.7 In the event that the Franchisee elects to renew this Agreement, the parties shall execute a new agreement containing such terms and conditions as are customarily included in such types of agreements by Franchisor at such time.

[Am. Compl., Exh. A., part 1.]

4

GeoVantage replied by letter on July 12, 2005.  It conceded that it had erred in its letter dated May 19, 2005 by declaring that the Franchise Agreement was expired.  GeoVantage agreed with Plaintiff that the Franchise Agreement would not expire until 11:59 pm on August 6, 2006.  GeoVantage did not agree, however, that it was aware of any action taken by its employees or by any third party to interfere with Plaintiff's business rights or obligations under the Franchise Agreement to provide airborne camera services.  Nor did GeoVantage agree that renewal of the Franchise Agreement was automatic upon written notice, and opined that certain prerequisites existed before the parties might renew the agreement.[3]  GeoVantage cited clauses 2.4–2.6 from Section 2 of the Franchise Agreement in support of its interpretation.

GeoVantage also denied having knowledge of any of John Deere's activities, which might have taken place in Ohio and which were relative to Plaintiff, its businesses or employees.  GeoVantage likewise denied any knowledge "of any action that it or its employees have taken, or that any third party has taken, that has interfered with, or could be considered interference with [Plaintiff's] business or rights or obligations under the Franchise Agreement."  Finally, GeoVantage drew attention to Section 21.2 of the Franchise Agreement, which states that any dispute arising from the interpretation of the agreement must be resolved by arbitration, in Boston, Massachusetts. [Am. Compl., Exh. A.]

On August 3, 2005, Plaintiff replied to GeoVantage's letter of July 12, 2005.  Plaintiff wrote that, in spite of GeoVantage's denial of any knowledge of interference with Plaintiff's

---

[3]Counsel for GeoVantage wrote in ¶ 2 of its letter, dated July 12, 2005:

Your letter of May 27, 2005 will be treated as [Plaintiff's] notice of its intent to renew or extend the relationship.  Please note, however, that renewal is not automatic, and it does not occur upon written notice to GeoVantage.  As described in Sections 2.4, 2.5 and 2.6, [Plaintiff] must have complied with the Franchise Agreement during the term and be in compliance with the Franchise Agreement at the time of renewal or extension.  [Am. Compl., Exh. E.]

rights under the Franchise Agreement, Plaintiff knew that Prisco had personally made phone calls to Graeme Jarvis and John Wagner. Plaintiff stated that Jarvis and Wagner were two individuals in Plaintiff's employ, who were responsible for operating the camera system. In these calls, Plaintiff alleged that Prisco had threatened lawsuit and "six figure exposure" if GeoVantage did not receive the camera system. [Am. Compl., Exh. F.]

Plaintiff also disagreed with GeoVantage's interpretation of Plaintiff's renewal rights in the Franchise Agreement. Whereas GeoVantage contended that the language of clauses 2.2 through 2.6 included only an option to renew the Franchise Agreement, provided certain prerequisites were met, Plaintiff interpreted the same language to mean it was entitled to an automatic renewal of the Agreement provided none of the disqualifying events had occurred.[4] [Am. Compl., Exh. F.]

On September 9, 2005, Plaintiff informed counsel for GeoVantage that Plaintiff had not received a response to its August 3, 2005 letter and was interpreting the silence as GeoVantage's refusal to comply with its obligations under the Franchise Agreement and to engage in any further discussion of the outstanding issues. Plaintiff stated that it had "no recourse but to take any and all appropriate steps to enforce the rights of GeoVantage of Ohio, LLC...." [Am. Compl., Exh. G.]

---

[4]The text of the letter, dated August 3, 2005, with respect to the renewal rights reads, in part:

Pursuant to Section 2 of the Franchise Agreement, [Plaintiff] is entitled to an extension of its Franchise Agreement provided none of the three specified conditions exist. (The Franchise Agreement uses "shall be" not "may" as you suggest.) Inasmuch as the first term of the franchise is 80% lapsed, and none of the disqualifying conditions have occurred, GeoVantage must renew the franchise, and must do so now. GeoVantage is not entitled to wait to the last minute of life in the Franchise Agreement, as you suggest, to approve the renewal.

On November 6, 2005, Pevear, who had negotiated the original Franchise Agreement for GeoVantage, sent an e-mail to Hamman containing the draft of a revised Franchise Agreement, which would potentially serve as the renewal agreement. The draft would have significantly altered the original Franchise Agreement. Section 21 in particular, contained several clauses outlining the parties' rights with respect to arbitration. The parties acknowledged that Section 21, as it stood, was ambiguous and contained conflicting language.[5] The new draft sought to rectify the ambiguities. Section 21 of the original Franchise Agreement reads as follows:

21. ARBITRATION

21.1    Any dispute between the parties in regard to the interpretation of this agreement, the effect of this agreement, the carrying out of this agreement and any other matter arising directly or indirectly out of this agreement, shall be submitted to and decided by Binding Arbitration.

21.2    Any arbitration proceeding through hereunder should be governed by the rules of the American Arbitration Association and shall be held in Boston, Massachusetts, accept [*sic*] where local franchise State or Provincial laws require Home States Rights.

21.3    In any arbitration or litigation of any kind arising out of the enforcement or interpretation of this Agreement, the court or arbitrator shall award, and the unsuccessful party shall pay the successful party's attorneys' fees, discovery costs, expert fees, and court costs.

---

[5]Bill Pevear wrote in his e-mail, dated November 6, 2005, explaining the numerous proposed changes to the original Franchise agreement:

To summarize, the principal changes to the existing franchise agreements are as follows:

[...]

5. Dispute Resolution and Other "Clean-Up": A number of provisions dealing with arbitration, governing law, etc. were either inconsistent with each other, or confusing. We have clarified these provisions. While we retained arbitration, we also included non-binding mediation prior to arbitration. We have found mediation to be beneficial - for all parties - in long-term franchise agreements. The dispute resolution provisions are a bit longer than the various sections in the original contracts, but we believe the new provisions remove the ambiguities."

[Am. Compl., Exh. H.]

21.4    Any dispute respecting the interpretation of this agreement or the performance of any party of its obligations contained herein shall be determined by arbitration in accordance with the New Brunswick Arbitration Act.  If the parties are able to agree to the appointment of one arbitrator, then the dispute shall be determined by such Arbitrator.  If, however, the parties are not able to agree to a single Arbitrator within twenty (20) business days, the dispute will be determined by three (3) Arbitrators, one to be named by Hyperspectral Data International Inc. and the other to be named by GeoVantage Inc. and the Arbitrators so chosen shall select one additional Arbitrator within ten (10) business days.  The award or decision of the majority of them shall be final and binding provided always that any party may appeal an award to the court on a question of law.  If either of the parties shall neglect or refuse to name its Arbitrator within (30) business days of a request in writing to do so following the appointment of the Arbitrator for the other party, the Arbitrator appointed shall act as sole Arbitrator and his decision shall be binding upon the parties hereto subject to the right of appeal as afore said.  Arbitration shall be held in Saint John with the costs to be shared equally by the parties.

21.5    If the parties do not agree to an arbitration process or are unable to resolve the dispute through arbitration, either party shall then have the right to pursue any legal remedy.

[Am. Compl., Exh. A., part 1.]

The suggested changes to Section 21, sent in Pevear's draft, consisted of four pages and were more detailed than the arbitration provisions of the original Franchise Agreement.  The draft changed the Section heading from "Arbitration" to "Dispute Resolution," and it included, among many other provisions, clauses on governing law and venue.  Plaintiff Hamman answered Pevear's e-mail on November 9, 2005, rejecting the proposed amendments.  Plaintiff claimed that the suggested changes fundamentally altered the economic terms of its franchise.  With respect to the existing provisions on arbitration, Plaintiff agreed with Pevear's statement that these were "inconsistent."  Plaintiff, however, went a step further and contended that the clauses on arbitration were unenforceable.  Plaintiff did say, however, that it was willing to include

appropriate provisions for dispute resolution in a renewed franchise agreement, so long as they were not "one-sided." [Am. Compl., Exh. I.]

On November 18, 2005, Plaintiff filed suit in the Court of Common Pleas for Madison County, Ohio. On December 22, 2005, the case was removed to this Court, and on the same day the Defendants filed their Corporate Disclosure Statement. In the Statement, GeoVantage identified itself as a "wholly owned subsidiary of John Deere Agri Service, Inc., which is a wholly-owned subsidiary of Deere & Company. Deere & Company is publicly owned." As a result, Deere Agri and Deere were included as Defendants along with GeoVantage and "JOHN DOES 1 through 8" in Plaintiff's Amended Complaint filed on December 27, 2005. Neither Deere Agri nor Deere are parties to the Franchise Agreement.

In its Amended Complaint, Plaintiff makes several claims for damages and other remedies. Its claims are: (Count I) declaratory judgment, (Count II) injunctive relief, (Count III) accounting, (IV) specific performance or additional territories, (V) specific performance or support and maintenance, (VI) breach of contract, (VII) tortious interference with contract, (VIII) civil conspiracy.

In response, Defendants have moved for (1) dismissal of the case, or (2) in the alternative, for a stay of the proceedings pending arbitration of the issues, and (3) a stay of the requirement that Defendants plead to Plaintiff's complaint and comply with discovery. The basis for Defendant's motion is clause 21.1 of the August 7, 2001 Franchise Agreement, which calls for the arbitration of "[a]ny dispute between the parties in regard to the interpretation of this agreement, the effect of this agreement, the carrying out of this agreement and any other matter arising directly or indirectly out of this agreement." [Am. Compl., Exh. A.] Defendants also

seek arbitration with the two Deere entities, even though neither Deere Agri nor Deere are parties to the Franchise Agreement.

Plaintiff opposes Defendants' Motion to Dismiss or Stay and contests the arbitrability of the issues, stating that the clauses in the arbitration section of the Franchise Agreement are inconsistent and ambiguous. Section 21.2, for example, requires that arbitration proceedings shall be held in Boston, Massachusetts, and should be governed by the rules of the American Arbitration Association. Section 21.4, however, calls for arbitration in St. John, Canada, in accordance with the New Brunswick Arbitration Act. Plaintiff argues that either the arbitration provisions of Section 21 of the Franchise Agreement are unenforceable or their ambiguity allows for the admission of parol evidence to show that the parties did not understand at the time of the signing that the Franchise Agreement required the arbitration of disputes.[6] In support of its position, Plaintiff seeks to introduce as parol evidence the affidavits of Carl Hamman and Eric Schooley, dated February 21, 2006, and February 22, 2006, respectively.

In the alternative, Plaintiff argues that Defendants waived their right to arbitrate through their actions subsequent to the execution of the Franchise Agreement. According to Plaintiff, Defendant's failure to arbitrate the dispute that arose between the parties with respect to the end date of the Franchise Agreement constitutes waiver. With respect to the John Deere entities, Plaintiff states there is no basis to compel arbitration against them as neither Deere Agri nor

---

[6]The Franchise Agreement provides in Section 23.2 that "[t]his Agreement constitutes the entire agreement between the parties hereto and no amendment or variation of this Agreement shall be of any force or effect unless reduced to writing and signed by the parties hereto." [Am. Compl., Exh. A.]

Deere were signatories to the Franchise Agreement.  Plaintiff opposes a stay of the claims against Deere Agri and Deere, asserting that a stay would unnecessarily delay discovery.

## II.

### A.    The Agreement Between Plaintiff and GeoVantage to Arbitrate

Arbitration is a matter of contract, and parties cannot be ordered to arbitrate where they have not agreed to do so.  *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  The primary purpose of the Federal Arbitration Act is not to give courts the authority to coerce arbitration, but to enforce those agreements to which parties have voluntarily entered.  *See Volt Info. Sciences v. Board of Trustees of Leland Stanford, Jr., Univ.*, 489 U.S. 468, 479 (1989).  It is the court's role to decide whether or not the parties agreed to arbitrate, unless the parties "clearly and unmistakably" provided for a person besides the court to make the decision.  *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986); *Warrior & Gulf*, 363 U.S. at 582-83.  This Court now examines the question of whether or not the parties voluntarily entered into an agreement to arbitrate the disputes at issue.

### 1.    Ambiguity of the arbitration clauses in the Franchise Agreement

Plaintiff asserts that the arbitration clauses of Section 21 of the Franchise Agreement are contradictory and ambiguous and seeks the introduction of parol evidence to show that the parties did not agree that arbitration was required.

Where an agreement falls within the jurisdiction of the Federal Arbitration Act, state law nevertheless governs issues concerning the agreement's validity, revocability and enforceability.

11

*Perry v. Thomas*, 482 U.S. 483, 492, n.9 (1987). The Court applies the law of Massachusetts in accordance with Section 23.3, the choice-of-law provision of the Franchise Agreement.[7]

Where a contract is clear and unambiguous, the court must construe its meaning from only the words contained in contract. *Merrimack Valley Nat'l Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977). In such a case, the parol evidence rule bars the introduction of evidence of discussions earlier or contemporaneous to the contract, which would modify or contradict the contract's provisions. *New England Financial Resources, Inc. v. Coulouras*, 566 N.E.2d 1136, 1139 (Mass. App. Ct. 1991).

Where a contractual term is ambiguous, however, its meaning is ascertained from the parties' intent as manifested in the terms of the contract and the circumstances surrounding the contract's creation. These circumstances may include the relationship of the parties, actions of the parties and established business usages. *Merrimack*, 363 N.E.2d at 690. *See also Wood v. Roy Lapidus, Inc.*, 413 N.E.2d 345, 347 (Mass. 1980) (construing the words used, the document as a whole, and the surrounding facts to determine whether the parties had intended in a letter to create a condition precedent, a condition subsequent, or an independent obligation).

In interpreting a contract, the court should "give effect to the parties' intentions and construe the language to give it reasonable meaning whenever possible." *Shea v. Bay State Gas Co.*, 418 N.E.2d 597, 601 (Mass. 1981) (applying considerations of good policy to the

---

[7]Section 23.3 reads:

"This agreement shall in all respects be governed by and construed in accordance with the laws of Massachusetts and all disputes, actions and other matters in connection therewith shall be determined in accordance with such law, accept [*sic*] where local franchise State or Provincial laws require Home States Rights."

interpretation of a contractual indemnity clause). "In other words, a contract must not, whenever possible, be construed so as to render any of its terms meaningless." *Id.* at 602.

Ambiguous provisions in a contract traditionally are construed against the drafter, and the ambiguous term is held to any reasonable interpretation attributed to that term by the opposing party. *Merrimack*, 363 N.E.2d at 690-91. In addition, where the terms of a contract are ambiguous, parol evidence of prior or contemporaneous discussions is admissible, but only to explain the ambiguity. Parol evidence may not be admitted to contradict or vary the terms of the written agreement. *See Robert Indus., Inc. v. Spense*, 291 N.E.2d 407, 409 (Mass. 1973); *Keating v. Stadium Management Corp.*, 508 N.E.2d 121, 123 (Mass. App. Ct. 1987).

Like the interpretation of the contract itself, the question of whether a contract is ambiguous is a matter of law for the court. *Berkowitz v. President & Fellows of Harvard College*, 789 N.E.2d 575, 581 (Mass. App. Ct. 2003). Terms of a contract are considered ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed." *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957, 963 (D. Mass. 1991) (citing *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989)). *See also, Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998) (holding, "[a] term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is a proper one."). Here, Plaintiff alleges that four provisions in Section 21 of the Franchise Agreement are inconsistent and ambiguous.

Plaintiff first directs the Court's attention to 21.1, which provides that all disputes are "to be submitted to *and decided* by Binding Arbitration (emphasis added). Plaintiff asserts that 21.1 conflicts with 21.5. Section 21 reads, in its entirety:

## 21. ARBITRATION

21.1    Any dispute between the parties in regard to the interpretation of this agreement, the effect of this agreement, the carrying out of this agreement and any other matter arising directly or indirectly out of this agreement, shall be submitted to and decided by Binding Arbitration.

21.2    Any arbitration proceeding through hereunder should be governed by the rules of the American Arbitration Association and shall be held in Boston, Massachusetts, accept [*sic*] where local franchise State or Provincial laws require Home States Rights.

21.3    In any arbitration or litigation of any kind arising out of the enforcement or interpretation of this Agreement, the court or arbitrator shall award, and the unsuccessful party shall pay the successful party's attorneys' fees, discovery costs, expert fees, and court costs.

21.4    Any dispute respecting the interpretation of this agreement or the performance of any party of its obligations contained herein shall be determined by arbitration in accordance with the New Brunswick Arbitration Act. If the parties are able to agree to the appointment of one arbitrator, then the dispute shall be determined by such Arbitrator. If, however, the parties are not able to agree to a single Arbitrator within twenty (20) business days, the dispute will be determined by three (3) Arbitrators, one to be named by Hyperspectral Data International Inc. and the other to be named by GeoVantage Inc. and the Arbitrators so chosen shall select one additional Arbitrator within ten (10) business days. The award or decision of the majority of them shall be final and binding provided always that any party may appeal an award to the court on a question of law. If either of the parties shall neglect or refuse to name its Arbitrator within (30) business days of a request in writing to do so following the appointment of the Arbitrator for the other party, the Arbitrator appointed shall act as sole Arbitrator and his decision shall be binding upon the parties hereto subject to the right of appeal as afore said. Arbitration shall be held in Saint John with the costs to be shared equally by the parties.

21.5    If the parties do not agree to an arbitration process or are unable to resolve the dispute through arbitration, either party shall then have the right to pursue any legal remedy.

14

[Am. Compl., Exh. A., part 1.]

Section 21.1 clearly requires arbitration of any matters regarding an interpretation of the Franchise Agreement, including all of the Plaintiff's claims in this case. Sections 21.2 through 21.5 set forth procedures to be followed in the course of arbitration. The final section, 21.5, provides that, if the arbitration procedures are not followed, either party may seek legal recourse outside of arbitration. This last provision in no way provides that arbitration is voluntary.

Plaintiff seeks to introduce parol evidence concerning the nature of their understanding of the arbitration clauses during and following negotiations for the clause. However, Plaintiff's evidence is submitted to contradict the terms of the contract, which clearly provide for the mandatory submission of disputes to arbitration. Parol evidence with respect to the enforceability of the arbitration clauses is therefore inadmissible.

Plaintiff also contends there is a conflict between Sections 21.2 and 21.4. Section 21.2 requires that disputes be arbitrated in Boston, Massachusetts, in accordance with the rules of the American Arbitration Association. 21.4, on the other hand, requires arbitration in accordance with the Canadian New Brunswick Arbitration Act, and gives the entity "Hyperspectral Data International, Inc." the authority to choose one arbitrator.

The Court observes that there is no other reference to Hyperspectral Data International, Inc. in the contract. The insertion of "Hyperspectral Data," which according to paragraph seven of William Pevear's Declaration is a Canadian franchisee, would appear to be a drafting error. If the Court construes the ambiguity between 21.2 and 21.4 against GeoVantage as the drafter of the contract, then the next question is whether Plaintiff's construction is reasonable, where it interprets these clauses to be "hopelessly in conflict" so as to render all the arbitration provisions

15

unenforceable. The Court finds that this interpretation is not reasonable. The Court focuses on the plain language of the arbitration provision and finds that the parties agreed to submit any disputes arising from the interpretation of the contract to arbitration. Plaintiff's attempt to avoid arbitration on the basis of an apparent drafting error is unavailing.

### 2.    The Broad Arbitration Clause and the Presumption of Arbitrability

Defendants argue that the claims Plaintiff asserts before this Court are covered by the broad arbitration clause of Section 21.1 and therefore should be submitted to arbitration.

The Supreme Court of the United States held in *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) that Section 2 of the Federal Arbitration Act expresses a liberal federal policy favoring arbitration agreements. 9 U.S.C. § 2 provides, in part:

> [A] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof...shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Thus, where a contract contains an arbitration clause, there exists a presumption of arbitrability, meaning "[an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf Navigation Co.*, 363 U.S. at 582-83.

The presumption of arbitrability is especially relevant in the instance of a broad arbitration clause that is untempered by an exclusion of any specific issue. *E.g., AT&T Technologies*, 475 U.S. at 650 (ruling that the presumption of arbitrability was particularly applicable to a clause providing for the arbitration of "any differences arising with respect to the

interpretation of this contract or the performance of any obligation hereunder.")  Where there is no express provision excluding a particular grievance from arbitration, the Supreme Court has stated that, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Warrior & Gulf*, 363 U.S. at 584-85.

Here, Section 21.1 is like the clause from *AT&T Technologies* in that it refers any "dispute" or "differences arising" from the interpretation of the contract to arbitration.  Section 21.1 reads:

> Any dispute between the parties in regard to the interpretation of this agreement, the effect of this agreement, the carrying out of this agreement and any other matter arising directly or indirectly out of this agreement, shall be submitted to and decided by Binding Arbitration.

There is no clause in the Franchise Agreement excluding any specific grievance from arbitration. Plaintiff brings five claims against GeoVantage, all of which relate to the interpretation, effect or carrying out of the Franchise Agreement.  The Court finds that the claims against GeoVantage fall within the language of Section 21.1 and are arbitrable.


**B.      Waiver of the Arbitration Agreement**

Plaintiff asserts that GeoVantage waived its right to pursue arbitration.  "Whether a party has waived arbitration is a question of arbitrability for the court to determine." *Martin v. Norwood*, 478 N.E.2d 955, 957 (Mass. 1985).  The party alleging waiver bears the burden of proof. *Niagara Fire Ins. Co. v. Lowell Trucking Corp.*, 56 N.E.2d 28, 31 (Mass. 1944).  The party bearing the burden of proof must also show that the entity who allegedly waived its contractual right, waived its right intentionally. *Id.*

Here, the Plaintiff alleges that GeoVantage's actions subsequent to the letter dated May 19, 2005 constitute a waiver of any right to submit a dispute in arbitration. The allegations Plaintiff makes are that GeoVantage terminated the Franchise Agreement and then attempted to reclaim the camera system without resorting to the use of arbitration to settle the dispute. The record, however, indicates that GeoVantage did not unilaterally terminate the Franchise Agreement. Rather, GeoVantage had surmised that the Franchise Agreement had expired and then attempted to collect the camera equipment.

The Court does not find that GeoVantage, through any action, has intentionally waived its right to submit disputes arising from the Franchise Agreement to arbitration.


C.      **The John Deere Entities**

Plaintiff seeks to avoid arbitration of its claims against Deere and Deere Agri. Defendants Deere and Deere Agri argue that they are entitled to compel Plaintiff to arbitrate based on the contractual theory of estoppel.

A court may hold that a party is estopped from asserting that a lack of a written arbitration agreement precludes arbitration. *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., Inc.*, 741 F.2d 342, 344 (11th Cir. 1984) (finding that the claims against the non-signatories were "intimately founded in and intertwined with the underlying contract obligations.") The Fourth Circuit has explained that the policy of allowing non-signatories to compel signatories to arbitrate through the principle of equitable estoppel "operates to prevent one party from holding another to the terms of the an agreement while simultaneously avoiding

18

the same agreement's arbitration clause." *R.J. Griffin & Co. v. Beach Club II Homeowner's Ass'n*, 384 F.3d 157, 165 (4th Cir. 2004).

Recently, the Sixth Circuit has applied the test used by the Fourth Circuit for determining when equitable estoppel applies against a signatory to an arbitration clause:

> [E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the ...agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.

*Am. Bankers Ins. Group v. Long*, 2006 U.S. App. LEXIS 17736 (quoting *Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 395-96 (4th Cir. 2005)). The Sixth Circuit further instructed that a court should examine the underlying complaint in its determination of whether or not to apply equitable estoppel. *Id.*

Here, Plaintiff's claims against both Deere Agri and Deere are for (1) injunctive relief from Defendants' alleged refusal "to acknowledge the continued validity and existence of the Franchise Agreement," which Plaintiff contends led to wrongful attempts by Defendants to seize the camera equipment; (2) tortious interference with contract, where Deere Agri and Deere are allegedly motivating GeoVantage to change the fundamental terms of the Franchise Agreement; and (3) civil conspiracy, where Defendants have allegedly "entered into a malicious combination with each other for the purpose of depriving Plaintiff of its rights under the Franchise Agreement, and interfering with those rights." [Am. Compl. ¶¶ 52, 57, 82, 88.]

Each of these claims relies on the interpretation of the Franchise Agreement. The liability of the John Deere entities turns on the scope of the Franchise Agreement between Plaintiff and

19

GeoVantage and the question of whether or not the Agreement has been breached.  In addition, many of the actions Plaintiff attributes to the Deere entities are the same as those attributed to GeoVantage.

Examining these claims in the Amended Complaint, the Court finds that each claim has arisen from or relates directly to the obligations existing between Plaintiff and GeoVantage in the written Franchise Agreement.  Therefore Plaintiff cannot, at least initially, avoid arbitration of the claims involving Deere Agri and Deere, even though the arbitration will proceed only with regard to Plaintiff and GeoVantage.


**D.     Motion to Stay**

Pursuant to 9 U.S.C. § 4, a district court lacks authority to compel arbitration in its district where the arbitration agreement calls for the arbitration of issues in a separate district. *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1018 (6th Cir. 2003).  A district court may, however, grant a motion to stay litigation in order that a motion to compel may be made in the appropriate district.  *See, e.g., Management Recruiters of Albany, Inc. v. Management Recruiters Int'l, Inc.*, 643 F. Supp. 750 (N.D.N.Y. 1986) (District Court in New York lacked authority to compel arbitration in Ohio under 9 U.S.C. § 4 where the franchise agreement called for arbitration of disputes in Ohio, but granted a motion to stay trial pursuant to U.S.C. § 3 so that a motion to compel arbitration could be filed in the appropriate district court in Ohio.)

20

### 1.      GeoVantage

The Federal Arbitration Act mandates that where parties have contracted to settle their

disputes by arbitration, a district court must grant a motion to stay litigation pending arbitration.[8]

*See Santos v. American Broad. Co.*, 866 F.2d 892, 894 (6th Cir. 1989) ("the [FAA] leaves no

place for the exercise of discretion by a district court, but instead mandates that district courts

shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has

been signed.").

This Court, having found that the parties agreed to arbitrate "any dispute arising from the

interpretation of the Franchise Agreement," and finding that GeoVantage has not waived its right

to arbitrate, grants a stay of the proceedings pursuant to 9 U.S.C. § 3 pending arbitration of all

claims against GeoVantage.

### 2.      The John Deere Entities

The circuit courts of appeal take different approaches in the application of 9 U.S.C. § 3 to

non-signatories.  The Eighth Circuit, for example, in *AgGrow Oils, L.L.C. v. Nat'l Union Fire*

*Ins. Co.*, 242 F.3d 777, 782 (8th Cir. 2001) ruled that arbitration was a matter of consent,

meaning a nonsignatory to an arbitration agreement was not entitled to a mandatory stay pursuant

to § 3.  Similarly, the Seventh Circuit has held that, "[a]lthough not expressly so limited, section

3 assumes and the case law holds that the movant for a stay, in order to be entitled to a stay under

---

[8]9 U.S.C. § 3 provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration
under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that
the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application
of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the
agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

the arbitration act, must be a party to the agreement, as must be the person sought to be stayed." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529 (7th Cir. 1997).

The Fifth Circuit, taking the opposite view, has applied § 3 to nonsignatories to arbitration agreements, reasoning that "the issues presented in the nonparty-party litigation if litigated would have rendered the arbitration redundant and thwarted the federal policy favoring arbitration." *Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001).

Within the Sixth Circuit, the District Court for the Northern District of Ohio has followed the law of the Eighth and Seventh Circuits on this matter. *Asahi Glass Co. v. Toledo Eng'g Co.*, 262 F. Supp. 2d 839, 844 (N.D. Ohio 2003). Where the district court has jurisdiction over a case, however, the court has the power to order a stay in the exercise of its own discretion. *Jewell v. Davies*, 192 F.2d 670, 672-73 (6th Cir. 1951) (stating, "[t]he district court of course had jurisdiction over petitioner's case and it therefore had the power to make the stay order.")

The district court in *Asahi* held that the movant for a stay bears the heavy burden of showing a discretionary stay is necessary. The stay should also not prejudice the non-moving litigant unduly. *Asahi*, 262 F. Supp. 2d at 845 (citing *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991). The Second Circuit in *Sierra* ruled that a discretionary stay is appropriate where the pending proceeding is in arbitration, during which issues involved in the case may be determined. *Sierra Rutile*, 937 F.2d at 750.

The Court is convinced that a stay is necessary in the instant case where the issues are all related to the interpretation of the Franchise Agreement and the question of whether or not it has been breached. The decision with respect to Plaintiff's breach of contract claim would significantly affect Deere Agri's and Deere's potential for liability. If the Court does not issue a

22

stay, Plaintiff would proceed to court on the issues of tortious interference, civil conspiracy and injunctive relief without knowing whether Defendants had breached the contract at issue.  In addition, the Court finds that arbitration will not cause undue hardship to Plaintiff.

Although the Court cannot enter a stay under 9 U.S.C § 3 as to Deere Agri and Deere since they are nonsignatories to the arbitration agreement, the Court, in the exercise of its discretionary power, grants a stay of the proceedings pending arbitration of the claims against Deere and Deere Agri.  As a final matter, the Court notes that any issues related to discovery are rendered moot.

## III.

In light of the foregoing, this action is hereby **STAYED** pursuant to 9 U.S.C. § 3 pending arbitration of all claims against Defendant GeoVantage.  The Court, in its discretion, also **STAYS** Plaintiff's claims against Deere Agri and Deere pending arbitration.  The Defendants' Motion **(DOC. # 12)** is **GRANTED** in part and **DENIED** in part, consistent with the foregoing. The Clerk is **DIRECTED** to Administratively Close this case.

**IT IS SO ORDERED.**

9-5-2006
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**